# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | |
|---|---|
| Tim Matheson ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 16 CV 50356 |
| ) | Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting ) | |
| Commissioner of Social Security,[1] ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

This is a Social Security disability appeal. At the administrative level, plaintiff Tim Matheson was partially—one might even say mostly—successful. The administrative law judge ("ALJ") concluded that plaintiff was permanently disabled as of July 6, 2014. Plaintiff is here because he believes the ALJ should have found him disabled starting two and a half years earlier—on January 27, 2012. This appeal is about this discrete period of benefits.

Plaintiff has numerous medical issues, including heart disease (causing shortness of breath), back problems, arthritis, depression, knee problems, and hand/arm/elbow/shoulder problems. Some of these issues were present, perhaps in less severe form, well before plaintiff's alleged onset date in January 2012. The heart problem, for example, goes back to at least 2004 when plaintiff had the first of many stents placed in his heart.[2] In 2006, he had arthroscopic surgery on his right knee. *Id.* at 2. In 2007 and 2008, he had surgeries to address back problems.

Plaintiff's last job was at Keene Technology where he worked for approximately eight months. He stopped working there on January 27, 2012, which coincides with the onset date he

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).
[2] Between 2004 and 2010, plaintiff had five stents placed in his heart. Dkt. #12 at 1-2.

chose for his claim. R. 39. According to plaintiff, this job was "very stressful and physically demanding." R. 353. After quitting, plaintiff sought medical treatment, and pursued a worker's compensation claim. According to plaintiff, the worker's compensation case went to trial and he was awarded some benefits, but the case was being appealed by the insurance company and was still not resolved at the time of the administrative hearing in this case.

Plaintiff has been seen by numerous doctors and nurses, including Dr. Rabor (cardiology), Dr. Gray (family physician), Nurse Elissa Russell, Dr. Gahl (pain doctor), Dr. Alexander (neurosurgeon), Dr. Hovis (rheumatology), and Dr. Carlson (orthopedist). Plaintiff's opening brief contains a lengthy, bullet-point list of his doctor visits, grouped into the following five topics: (i) coronary artery disease; (ii) right knee; (iii) lumbar spine; (iv) hands/arms; and (v) shoulders.

For the pending worker's compensation case, two doctors were asked to evaluate plaintiff's condition. Plaintiff's counsel asked Dr. Jeffrey Coe to examine him and prepare a report.[3] His report is a six-page, typed letter that was addressed to plaintiff's counsel. The letter describes plaintiff's medical history and his job duties at Keene Technology, and then offers the following conclusion: "[I]n my opinion, Mr. Matheson is in need of work restriction due to the condition of ill-being of his lower back. Appropriate work restriction would include limitation in the lifting to the 'light' physical demand level with avoidance of repetitive bending or twisting at the waist." R. 338. The other opinion was prepared by Dr. Edward Goldberg and sent to a Chicago law firm. Dr. Goldberg also examined plaintiff. His report is four pages, and also summarizes the medical evidence. Dr. Goldberg reached several conclusions, but concluded that he believed that plaintiff could "return to work at a light level." R. 818.

---

[3] Dr. Coe is board certified in occupational medicine. R. 333.

On July 7, 2015, a hearing was held before the ALJ. Plaintiff testified about his medical conditions, work history, the pending worker's compensation case, his wife who was on medical leave, his daily activities, and other matters. The ALJ asked plaintiff why he could not work a less demanding job than the one at Keene, such as an usher at a theater. Plaintiff stated that he could not stand or sit for more than 20 minutes and that he took Percocet and Norco every four hours. Set forth below is plaintiff's description of a typical day, which mostly consisted of sitting in a recliner with a pillow under his legs:

> Oh, when I wake up in the morning it's usually coffee; sit in the recliner for 10 to 15/20 minutes and go take a shower; eat some breakfast; go back to the recliner. Well, that's usually around 6:30/7:00 a.m. is when I take all my medications, other than the pain medications. The first dose of pain medication is within ten minutes of waking up. All my heart meds and everything else are all taken at the same time. I don't split them up during the day, it's all at once and that's in the morning. Watch TV; read; may be on a Notebook for a little while; usually back in bed between 11:00 and 12:00 noon for anywhere from a half-an-hour to two hours and back up; go through the same thing with the TV or reading in the recliner, pillows underneath my legs. I normally don't eat lunch. I'll have dinner around anywhere from 5:00 to 6:00 and we're usually in bed no later than 8:00 or 8:30 where we'll watch TV there.

R. 51.

On September 24, 2015, the ALJ found that plaintiff was disabled as of July 6, 2014. Like most ALJ decisions, this one contains a narrative section that is mostly a chronology of doctor visits, but that also periodically intersperses indirect commentary. Later in the decision, the ALJ provided more formal analysis of four medical opinions: the two worker's compensation opinions (Dr. Coe and Dr. Goldberg) and two opinions from State agency opinions (Dr. Panepinto and Dr. Arjmand). All of these opinions found that plaintiff could do light work, although they differed slightly in certain additional restrictions. The ALJ accepted and relied on these opinions for the most part, except that the ALJ ultimately concluded plaintiff's pain allegations were credible enough that he could only do sedentary, as opposed to light, work up

until July 6, 2014, and that he could do no work thereafter. The ALJ found that plaintiff's condition had worsened since the four doctors rendered their opinions.[4]

## ANALYSIS

Plaintiff raises two arguments for remand. The first argument rests on two statements taken from Dr. Gray's office notes. If the first argument focuses laser-like on a narrow part of the medical record, the second argument diffusely ranges over the entire medical record. Plaintiff asserts that the ALJ failed to consider the cumulative effect of his long list of problems. As explained below, both arguments fail because they ultimately require this Court to simply re-weigh the evidence and then reach a conclusion different from the one reached by the ALJ.

**I.     Dr. Gray's Opinions.**

The first argument has a very narrow focus. Plaintiff relies on two statements taken from Dr. Gray's treatment notes. The first statement was taken from the notes of plaintiff's January 30, 2012 visit. Plaintiff relies on the following sentence: "I don't think the physical nature of his job is a good fit for his chronic back problems." R. 354. The second one is from the notes of plaintiff's April 24, 2012 visit. Plaintiff again extracts a single sentence, which is the following:

---

[4] The ALJ cited to the following evidence as the reason why she chose the date of July 6, 2014 as the point where plaintiff's ailments became too severe to work even a sedentary job:

> [T]he undersigned finds that beginning on July 6, 2014, the claimant's allegations regarding his symptoms and limitations are generally credible. On July 6, 2014, the claimant sought treatment for low back pain at Rockford Memorial Hospital. The claimant reported that he had been doing well until the night prior to seeking treatment and he woke up on July 6, 2014 with increased pain in his back. Upon exam, the claimant had a decreased range of motion, spasms and pain in his lumbar spine. The treatment notes indicate that the claimant reported some improvement with pain medications, but he returned to the emergency room less than a week later with reports of increased back pain. In addition to the documented increase in the claimant's back pain as of July 6, 2014, the medical record also indicates that the claimant's coronary artery disease worsened after July 2014 and he required several additional stent placements and catheterization procedures in 2015. The medical record also indicates that the claimant continued to report pain in his elbow and increased pain in his fingers during follow up appointments with Dr. Gray in 2015. On May 13, 2015, Dr. Gray noted the claimant's fingers were swollen and the claimant reported an increase in his hand pain that radiated into his forearms. The claimant also reported that his back pain made it difficult for him to get out of bed.

R. 24 (internal citations omitted).

"He is still unable to do any lifting, pulling, pushing, twisting, bending, or prolonged sitting or standing." R. 360. Plaintiff argues that these two statements—perhaps individually, perhaps taken together—constitute a "medical opinion" from his treating physician and, as such, should have been given controlling weight under the treating physician rule.

Plaintiff's argument contains a procedural and a substantive component. Procedurally, he complains that the ALJ never formally or explicitly discussed these two statements in the later part of the decision where the ALJ discussed the opinions of the other four doctors (Coe, Goldberg, and the two agency physicians). Plaintiff also argues that the ALJ failed to explicitly follow the two steps of the treating physician rule which require, among other things, that the ALJ apply the checklist of six factors. Plaintiff acknowledges that the ALJ summarized at least one of the two statements in the ALJ's earlier discussion of plaintiff's doctor visits. But plaintiff states that this was not an "analysis." Substantively, plaintiff argues that Dr. Gray's opinions were "not surprising" given that, "[b]y 2012, Plaintiff had 5 stents in his heart, a previous lumbar fusion, a prior right knee arthroscopy." Dkt. # 12 at 8. Plaintiff states that Dr. Coe's and Dr. Goldberg's opinions were "made regarding Plaintiff's lumbar injury only (for Plaintiff's worker's compensation case)" whereas Dr. Gray's statements reflected his understanding of the "entirety" of plaintiff's ailments. *Id.* at 8-9. Plaintiff thus argues that Dr. Gray was in "the best position to judge Plaintiff's disabilities." *Id.* at 9.

In response, the Government does not directly address plaintiff's procedural arguments. Instead, the Government focuses on the substantive arguments and argues that Dr. Gray's statements were inconsistent with both his own later statements and with the opinions of the other doctors. Although the Government's argument does not rigorously follow all the steps of the treating physician rule, it nonetheless loosely tracks key parts of it. Specifically, the

5

Government's two consistency arguments are relevant to both Step One ("not inconsistent with the other substantial evidence") and Step Two (factor #3 (supportability) and factor #4 (consistency)). In short, the Government's argument could be viewed as a de facto harmless error argument. As explained below, the Court concludes that it is appropriate to *sua sponte* invoke the harmless error doctrine here because the Court is confident that, if this case were remanded and if the ALJ then explicitly applied the treating physician rule to these two statements, she would reach the same result. *See Alvey v. Colvin*, 536 Fed. Appx. 792, 794 (10th Cir. 2013); *Smith v. Colvin*, 2015 U.S. Dist. LEXIS 33462, at *11 n. 2 (W.D. Okl. Feb. 23, 2015); *Mangan v. Colvin*, 2014 U.S. Dist. LEXIS 120515, at *2 (N.D. Ill. Aug. 28, 2014). This conclusion is based on several factors.

First, plaintiff's argument rests on the premise that Dr. Gray's two statements, if accepted, would compel a finding that plaintiff was disabled as January 27, 2012. This initial premise is debatable. The two statements are equivocal about whether Dr. Gray believed, at that time he made each statement, that plaintiff was *permanently* disabled from working *any* job. Consider especially the first statement ("I don't think the physical nature of his job is a good fit for his chronic back problems."). This statement was made just three days after plaintiff stopped working at Keene, and is clearly linked to that job and especially its "physical nature." Earlier in these same notes, Dr. Gray wrote that plaintiff stated that he had to carry around a 50-pound toolbox on this job, that he was required to take "long drives (6 hours at a time)," and that the job was generally "very stressful, and physically demanding."[5] R. 354. Given this context, Dr.

---

[5] Later, when talking to Dr. Coe, plaintiff described these duties in even more onerous terms. *See* R. 333 ("Mr. Matheson states that his work at Keene Technology involved maintenance, repair and installation of machines in the paper industry. He states that the work was carried out for 8 or more hours per day (occasionally 18 hours on days when machines were being installed). Mr. Matheson states that he was required to bend, kneel, squat and perform heavy work in awkward positions. He states that he also lifted a 50-pound toolbox repeatedly on each workday. Mr. Matheson also states that he wore a tool belt (weighing approximately 50 pounds) throughout each work day."). According to this description, plaintiff was carrying 100 pounds at a time with some regularity.

Gray's statement reasonably could be viewed as an opinion limited only to the question of whether plaintiff could do this one particular job. However, the ALJ never found that plaintiff could work a job similar to this one; instead, the ALJ limited plaintiff to sedentary work with certain other restrictions. Dr. Gray's statement that the Keene job was not a "good fit" implies that other jobs might be a better fit. Dr. Gray did not offer a broader opinion that plaintiff could not work any job. Nor did Dr. Gray state that he felt the problems were permanent. His statement is consistent with the view that plaintiff's current back problems might abate if he no longer had to work such a strenuous job. Finally, contrary to plaintiff's earlier suggestion that Dr. Gray's statements addressed more than just plaintiff's back problems, this one is explicitly tied to plaintiff's "chronic back problems" and makes no reference to other problems.

The second statement is not explicitly tied to the Keene job, and is thus potentially more helpful to plaintiff's case, but it is still ambiguous on whether Dr. Gray believed plaintiff's problems were permanent or whether, instead, he believed that they might improve after treatment. Dr. Gray stated, in the sentence just before the one plaintiff is relying on, that plaintiff had an "[a]cute exacerbation of chronic low back pain." R. 360. Therefore, the following sentence referring to plaintiff's limitations is presumably connected to this recent "acute" injury. By definition, an acute injury carries with it the possibility that may not be permanent. *See Stedman's Medical Dictionary* at p. 23 (defining "acute" as "[r]eferring to a health effect, usually of rapid onset, brief, not prolonged"). And, when the later evidence is considered (as discussed below), this interpretation finds support. Also, as with the first statement, Dr. Gray specifically tied this one to plaintiff's back problems, again undercutting plaintiff's argument here that Dr. Gray's two statements are more credible because they addressed the entire set of problems.

7

Second, there is another reason why the ALJ may not have viewed these two statements as dispositive medical opinions on the same level as the other four. Plaintiff's counsel at the administrative level never identified them as such. Before the administrative hearing, counsel submitted a two-page letter brief. Ex. 13E. This brief discusses specific evidence, but it never refers to these two statements. The only substantive reference to Dr. Gray was the following: "Claimant has also been diagnosed by Dr. Gray, his primary care doctor, with depression." R. 320. During the hearing, counsel likewise did not flag either statement. After the ALJ issued her decision, counsel wrote a two-page letter brief to the Appeals Council. *See* Ex. 15E. This letter likewise makes no reference to either statement, despite referring to specific pieces of evidence. The only reference to Dr. Gray is the following: "Claimant received additional injections by Dr. Gray in June, July, August, and September 2013." R. 323. The doctor featured most prominently in this letter brief is Dr. Carlson. *Id.* Plaintiff specifically complained that the ALJ did "not describe the treatment records from Dr. Carlson in any detail." *Id.* However, now, before this Court, plaintiff downplays Dr. Carlson's notes and instead puts the focus back on Dr. Gray.[6] In sum, at the administrative level, plaintiff did not highlight these particular two statements in the way he now does to this Court.

Turning back to the Government's two main consistency arguments, the Government argues first that plaintiff has focused on only two visits to Dr. Gray and ignored plaintiff's later visits with Dr. Gray, which provide evidence undermining or at least complicating the earlier picture. In short, the Government criticizes plaintiff for cherry-picking. The ALJ summarized the findings from plaintiff's later visits with Dr. Gray, specifically visits on June 9, 2012; December

---

[6] The Court notes that neither of the parties, nor the ALJ, discussed Dr. Carlson's January 9, 2014 letter which states, among other things, that the "goal" of treatment was to "return [plaintiff] to both ADLs and the workplace as soon as possible." R. 571. This statement evidences that Dr. Carlson did not view plaintiff as being permanently disabled.

8

8, 2012; and May 23, 2014. For example, the ALJ stated the following: "The claimant continued to report back pain during a follow up appointment with Dr. Gray on December 8, 2012 (Ex. B3F/21-22). However, he acknowledged his pain medication regimen worked pretty well, and the exam of his extremities showed no abnormalities[.]." R. 20. The ALJ's description (for example, the use of the word "however") suggests that the ALJ believed that plaintiff's condition had stabilized to some degree. This Court agrees with plaintiff that it would have been better if the ALJ had been more explicit. Still, on balance, the ALJ's summary shows that she had questions whether plaintiff's condition still might improve. The ALJ also provided the following, fairly detailed description of plaintiff's May 23, 2014 visit with Dr. Gray:

> Dr. Dale Gray examined the claimant on May 23, 2014. The claimant reported a recurrence of his right shoulder pain, and continuing back pain. The claimant denied any shortness of breath on exertion, and also denied any chest pain. Upon exam, the claimant's heart sounds were normal, and his chest was clear to auscultation. Dr. Gray's exam of the claimant's extremities showed no abnormalities, and Dr. Gray indicated his coronary artery disease was stable and his hypertension was controlled. The claimant's pain medication was refilled.

R. 22 (internal citations omitted). This description contains many details supporting the ALJ's larger theory that plaintiff's problems were not yet severe enough to prevent him from working a sedentary job. Plaintiff's argument mostly ignores these later findings by Dr. Gray. Even if the ALJ accepted plaintiff's more aggressive interpretation of Dr. Gray's two earlier statements, the ALJ would have had to consider these later statements and reconcile them to reach a fair assessment of Dr. Gray's overall opinion. It should be noted that Dr. Gray did not complete one of the standard questionnaires or forms that are often given to treating physicians. Doing so likely would have dispelled some of the ambiguity about what Dr. Gray believed about plaintiff's ability to work.

9

The Government's second consistency argument focuses on the other medical opinions and statements. The Government argues that Dr. Gray's two statements are at odds with the formal medical opinions of Dr. Coe, Dr. Goldberg, and the two State agency physicians, all of whom found that plaintiff could do light work subject to certain restrictions. It is particularly noteworthy that Dr. Coe was the doctor plaintiff's counsel selected to provide an opinion. Plaintiff has no convincing response to this evidence. Plaintiff has asserted that Dr. Coe and Dr. Goldberg only addressed plaintiff's back problems, whereas Dr. Gray's two statements reflected a broader consideration of all of plaintiff's problems. But the problem with this argument is that, as noted previously, both of Dr. Gray's statements are explicitly tied to just the back problems.

In addition to the formal opinions, Dr. Gray's two statements are at odds with the examination findings from other treating physicians. The Government notes, for example, that Dr. Rabor found that plaintiff had normal range of motion and that Dr. Uehara, an emergency room doctor, found that plaintiff had good range motion in all major joints. Dkt. #13 at 4. The ALJ's summary of the evidence describes many similar normal physical examination findings. Consider, for example, the knee problems, which plaintiff complains were one reason he could not work in January 2012. However, the ALJ noted that a July 2012 X-ray showed "there were no abnormalities" in the knee. R. 20. The ALJ further noted that an MRI in March 2013 showed only "mild thinning of the medial patellar retinaculum, but no ligament tears or any other abnormality." *Id.* Similar findings were made about the elbow problem. As the ALJ noted, these complaints emerged primarily in late 2013 and early 2014—*i.e.* much closer to the ALJ's chosen onset date than plaintiff's date—and even then, "his physical exams showed no motor weakness or sensory abnormalities." R. 21. Here is part of the ALJ's summary of the elbow-related evidence:

> The claimant also testified that his elbow impairment and pain in his hand prevented him from holding things and that he was no longer able to write. However, prior to July 6, 2014, there is no indication that the claimant's elbow impairment prevented him from using his right arm, x-rays of his hands performed on September 26, 2012 showed only mild joint space narrowing in a few of the joints in his fingers; rheumatoid testing showed no signs of rheumatoid arthritis. In addition, as late as August 2013, the exam of the claimant's right elbow showed mild swelling, but no focal motor strength weakness or instability in his right elbow.

R. 23 (internal citations omitted). Significantly, in his reply brief, plaintiff has not disputed that this and other evidence was contrary to his theory of the case and was relied on by the ALJ. Plaintiff's only argument is that the ALJ should have analyzed this evidence more explicitly and should have analyzed Dr. Gray's two statements in the same section that she analyzed the four, more formal opinions. *See* #14 at 2 ("Shouldn't the treating source at the least get the same treatment when he/she gives an opinion?"). The Court has already provided several reasons for why the ALJ may not have formally analyzed Dr. Gray's two statements. Another point that should be mentioned is that, although the ALJ analyzed those four opinions more explicitly, this ALJ still did not apply the checklist of factors when doing so.

In sum, the Court agrees that, at various points, the ALJ could have been more explicit in her analysis. But on balance, the Court finds that the ALJ relied on a strong and fairly consistent body of evidence to support her conclusions. For this reason, any failure to further analyze Dr. Gray's two statements under the treating physician rule was harmless error.

**II.     Combined Effect.**

Plaintiff argues that the ALJ failed to consider the combined effect of his "multiple, chronic and severe conditions." Dkt. # 12 at 10. In his opening brief, plaintiff specifically mentions the following facts that were supposedly overlooked: that he testified that he had chronic shortness of breath from his stents; that he was on Percocet for back pain; and that he

testified that has difficulty standing, walking, and sitting. After listing this evidence, plaintiff then focuses on two topics: shortness of breath, and hand/shoulder/elbow problems. In the briefing process, plaintiff and the Government go back and forth on these topics, with each side flagging pieces of evidence allegedly supporting its theory. For example, in his opening brief, plaintiff notes that he complained about shortness of breath "on multiple occasions in June 2012." Dkt. #12 at 11. The Government responds by noting that the ALJ relied on the fact that, at two later visits with Dr. Gray (one in December 2012 and another in May 2014), plaintiff did not have any problems with shortness of breath. Dkt. #13 at 6. In his reply brief, plaintiff lets this argument drop, offering no further rebuttal. Dkt. #14 at 3-4. A similar assert-and-riposte dynamic ensues over the hand/shoulder/elbow problems.

This Court need not referee these evidentiary volleys because this entire process suggests that each side is making reasonable arguments by drawing on differing data points from the mixed-picture medical record. In such a case, when there is conflicting evidence about which reasonable minds could differ, this Court "must" defer to the ALJ's interpretation so as long as it one of those reasonable interpretations. *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014). Therefore, even if the Court were to find plaintiff's weighing of the evidence to be more persuasive, it would still be obligated to affirm the ALJ's conclusion.

Another way of assessing the ALJ's overall decision is to focus not on the two errors identified by plaintiff, but instead to consider the other evidence relied on by the ALJ. There are significant parts of the ALJ's decision that plaintiff has not challenged. As noted above, plaintiff has not challenged the specific analysis provided by the four doctors who all found that plaintiff could do light work. Plaintiff has not challenged the ALJ's credibility finding. Plaintiff has not argued that the ALJ made any factual errors or ignored any line of evidence. Plaintiff has not

argued that an expert witness should have been called to clarify any medical issues. The larger question in any Social Security disability appeal is whether the ALJ relied on substantial evidence. Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Here, the Court finds that the ALJ relied on substantial evidence.

One final point deserves mention. Although the ALJ found that plaintiff's daily activities before July 6, 2014 were inconsistent with his allegations of having more debilitating problems, the ALJ did not provide a lengthy discussion. The ALJ noted, earlier in the decision, that plaintiff's own description of his daily activities showed that he "prepared basic meals, went outside on a daily basis, drove a car and shopped in stores on a regular basis." R. 17. Later in the decision, the ALJ noted a discrepancy regarding plaintiff's handwriting abilities. *See* R. 23 ("While the claimant testified that as of the date of the hearing, he was unable to write because of his hand impairment, he completed a detailed, hand written function report on May 7, 2013[.]"). However, in reviewing the record, the Court located several other statements suggesting that plaintiff was leading a more vigorous life than the recliner-bound existence he portrayed at the hearing. *See, e.g.,* R. 545 (6/10/13: plaintiff reported that "he has been helping with a bathroom remodel"); R. 547 (6/20/13: "The patient understands physical therapy exercises, and has pursued these on a regular basis as recommended."); R. 583 (2/25/14: plaintiff "asks when he should be able to get back to golfing"); R. 597 (4/21/14: plaintiff reported that "he was able to start his rototiller with his right arm the other day without thinking about it"); R. 54 (plaintiff went on a week-long fishing trip to Canada in October 2014). These statements could have been cited by the ALJ to provide even greater support for the credibility finding. This is another reason why the harmless error doctrine is appropriate here.

## CONCLUSION

For all the above reasons, plaintiff's motion for summary judgment is denied, the government's motion is granted, and the decision of the ALJ is affirmed.

Date: January 22, 2018        By: _____
                                  Iain D. Johnston
                                  United States Magistrate Judge